| | |
|---|---|
| 1 | JOANNA SHERIDAN (CABN 260090) |
| 2 | J.P. Sheridan Law |
|   | 601 Montgomery Street, Suite 850 |
| 3 | San Francisco, CA 94111 |
|   | Telephone:   (415) 347-2700 |
| 4 | Facsimile:    (415) 347-2701 |
|   | Email:         joanna@jpsheridanlaw.com |
| 5 | |
| 6 | Counsel for Defendant, Allan Pacheco Padilla |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 25-cr-00021 VC |
| Plaintiff, | SENTENCING MEMORANDUM OF DEFENDANT DAVIS AND MOTION FOR DOWNWARD VARIANCE |
| v. | |
| ALLAN PACHECO PADILLA | Honorable District Judge Vince Chhabria |
| Defendant. | Date: May 21, 2025<br>Time: 1:00 pm |

Defendant Pacheco Padilla, by and through his counsel Joanna Sheridan, hereby recommends that the Court impose a term of "time served" following defendant's guilty plea to Count 1 of the Superseding Information, Distribution of Fentanyl in violation of 18 U.S.C § 841(a)(1) and (b)(1)(C). Allan Pacheco Padilla was 20 years old at the time of the offense and has no criminal history. His deportation after this custodial term is a virtual certainty. A downward variance to time served (6 months of pretrial custody) is sufficient but not greater than necessary to satisfy the goals of 18 U.S.C.§ 3553 in light of his youth at the time of the offense, his minor role in the drug conspiracy, his years of gainful employment before this crime and his appreciation for the harm he has caused.

## I. Summary of Case Facts

February of 2024, the FBI and DEA began an investigation into the Cruz-Banegas DTO, believed to be distributing narcotics in the Bay Area and based in Oakland.[1] Undercover agents conducted a series of controlled buys from "Daniella" Cruz-Banegas and her associates in the months of February and April, 2024. Allan Pacheco Padilla was not present during any of those transactions and was not identified during surveillance associated with this DTO until October, 2024.

On October 17, 2024, a UC placed a call to "Daniella" to set up a transaction, but a male voice answered. His name was "Jonatan"[2] and he told the caller that "Daniella" was sleeping and took an order for her. The UC then called back and spoke to "Daniella" who said she needed 10 more minutes. When the UC called back a third time, "Jonathan" picked up and said he would be making the delivery. "Jonatan" initially delivered approximately 8 ounces of fentanyl to an undercover agent in Oakland, and went back to Ms. Cruz-Banegas's residence to obtain an additional 2 ounces when the UC asked for more. In total, Mr. Pacheco Padilla is responsible for distributing 10 ounces of fentanyl that day.

On November 20, 2024, a search warrant was executed at Ms. Cruz-Banegas' home. Mr. Pacheco Padilla was arrested in a traffic stop nearby. He had a small bag of suspected narcotics in his pants pocket. A sizeable quantity of fentanyl, a firearm and cash were located within the Cruz-Banegas residence, but there is no evidence to attribute that evidence to Mr. Pacheco Padilla.

## II. Guidelines Calculation and Probation's Recommendation

The final Presentence Investigation Report ("PSR") has determined that Mr. Pacheco Padilla's offense level should be calculated as follows:

<u>Count 1</u>:
| | | |
|---|---|---|
| Base Offense Level: | 28 | (2D1.1(a)(5)) |
| Role in Offense Adjustment: | -2 | (3B1.2(b)) |
| Acceptance of Responsibility: | -3 | (3E1.1) |
| Zero Point Offender: | -2 | (4C1.1(a) and (b)) |
| **Total Offense Level:** | **21** | |

---

[1] Three members of the DTO targeted by this federal investigation, including Cruz-Benegas, are currently charged in case number 24-cr-00577 RFL.
[2] Jonatan is Mr. Pacheco Padilla's middle name. He was initially charged by complaint using only the name "Jonatan" because that was the only identifier known to the task force on November 18, 2024.

The parties are in agreement with this calculation, which corresponds to the guideline levels set forth in Mr. Pacheco Padilla's plea agreement. For offense level 21 and Criminal History Category I, the United States Sentencing Guidelines recommends a prison term between 37 and 46 months. The Probation Office recommends a downward variance to 22 months in prison, citing the defendant's upbringing and his limited role in the offense, balanced against the quantity of drugs involved and the need to protect the community. Mr. Pacheco Padilla is remorseful for his role, however small, in distributing a substance that can truly harm people. PSR ¶ 18. He respectfully requests that the Court grant his motion for a variance to time served in light of the facts and circumstances set forth below.

### III. Mr. Pacheco Padilla's Argument and Sentencing Recommendation

#### 1. General Principles Governing Sentencing

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States,* 131 S.Ct. 1229, 1239-40 (2011) (citation omitted). This tradition is based on the principle that the punishment must fit the offender, not just the crime. *Id.* at 1240.

In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines (USSG) are "effectively advisory" and no longer mandatory. *Id.,* at 245. "In the wake of *Booker*, federal sentencing is now governed by 18 U.S.C. § 3553(a)." *United States v. Menyweather*, 431 F.3d 692, 695 (9th Cir. 2005).

A "variance" outside the guideline range provided in the Guidelines Manual should occur after consideration of all relevant departure provisions. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). In *Gall*, the Supreme Court rejected the notion that a sentence amounting to a substantial variance from the Guidelines needs to be justified by extraordinary circumstances, holding instead that appellate courts must review all sentences, both within and without the Guidelines range, under a differential abuse of discretion standard. *Id*. Two subsequent Supreme Court decisions, *Spears v. United States*, 555 U.S. 261 (2009) and *Nelson v. United States*, 555 U.S. 350 (2009) reiterated that the Guidelines are now truly advisory and that there is no presumption at the district court level that a

Guidelines sentence is inherently reasonable.

In accordance with *Booker*, the Court must impose a sentence consistent with the purposes set forth with the 18 U.S.C. §3553(a). The primary directive in § 3553(a) is that the Court fashion a sentence that is "sufficient, but not greater than necessary" in order to comply with the purposes of punishment set forth therein. Those purposes are (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). In determining whether a sentence is "sufficient, but not greater than necessary" to accomplish these purposes, courts must consider certain factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," §3553(a)(1); the guidelines sentencing range and any applicable Sentencing Commission policy statements, §3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," §3553(a)(6).

Accordingly, Mr. Pacheco Padilla addresses the following section 3553(a) factors for the Court's consideration in its determination of the appropriate sentence in his case.

### 2. Application of the Section 3553(a) Factors

#### a) 3553(a)(1) - History and Characteristics of Allan Pacheco Padilla

##### i. A Childhood in Poverty

Mr. Pacheco Padilla was born in Honduras and is the eldest son in his family. PSR ¶38. Growing up, his family struggled to survive without access to sufficient water or food. When they had money to buy water they would do so, but with naturally available water coming only once per month or not at all, he and his brothers would often walk to another town to bring back water in a wheelbarrow. His family would often skip meals, eating a meal of rice, beans and tortillas only once per day. PSR ¶ 39.

To help support his family, Allan Pacheco Padilla started working at 13. He tended to cows and worked as a mason's assistant. He left school in the ninth grade to focus on working. PSR ¶ 40.

### ii. Migration for a better life

At 16 years old, Mr. Pacheco Padilla left home for the United States. He was close with his family and would have rather stayed at home to work and build a life for himself, but there weren't enough jobs in his community for unskilled labor. He made the dangerous trip north along a similar route as many other migrants, traveling by foot to Mexico and then riding on top of the train known as "the Beast". He was with peers but without parental guidance. He saw people fall off of the train, including one man whose head split open. PSR ¶ 41. He also saw other people being robbed, but was lucky to avoid that fate himself. *Id.*

When he arrived in the United States, Mr. Pacheco Padilla focused on what he had come to do: he got a job in construction. He worked in Maryland, then moved to Atlanta, gaining valuable trade skills in building, welding and roofing. He couldn't find stability, due to his undocumented status, but was able to attend school for 3 months in Atlanta. PSR ¶ 41, 50. His focus was on work and sending 200 to 300 dollars home to his family every month. PSR ¶ 46.

### iii. A Youthful Offender

Mr. Pacheco Padilla was 20 years old when he made the regrettable decision to help his friend by dropping off drugs to one of her customers. He is, by definition, a "youthful offender." [3] The Sentencing Commission has highlighted research on brain development confirming that the prefrontal cortex, which is responsible for decision making and impulse control, is not complete until the average age of 25. [4]

Scientists have studied emerging adulthood—age 18 to 25—as a period of life distinct from both adolescence and adulthood. [5] The brain undergoes at least four significant structural changes as people age, which directly affect the potential for criminal behavior. [6] The first process, called

---

[3] *See* U.S. SENT'G COMM'N, YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM, 5 (May 2017) https://www.ussc.gov/sites/ default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf
[4] *Id.* at 7.
[5] Gibbons & Ashdown, A Review of Emerging Adults in America: Coming of Age in the 21st Century, 51 PsycCRITIQUES 3, 3 (2012); MIT Young Adult Development Project, https://bit.ly/3mEa9Ss (last visited November 23, 2021).
[6] Steinberg, Does Recent Research on Adolescent Brain Development Inform the Mature Minor Doctrine?, 38 J. Med. &

synaptic pruning, improves an individual's information processing network, resulting in improvements in basic cognitive functions.[7] Next, there is a greater amount of dopaminergic activity in pathways that connect to the limbic system, resulting in an increase in sensation-seeking behavior.[8] Adolescents then exhibit an increase in white matter in the prefrontal cortex, which improves the ability to plan ahead, weigh risks and rewards, and make advanced decisions.[9] Lastly, there are more connections between the prefrontal cortex and the limbic system, which enhances emotion regulation and self-control.[10]

Individuals under age 25 are neurologically disposed to immature behavior while the "executive, attention, reward, and social processes" functions continue to develop.[11] They are unable to anticipate the future consequences of their actions and therefore have an "underdeveloped sense of responsibility."[12] As a result, risky behavior peaks "not during adolescence but during emerging adulthood (ages 18–25)."[13] Research reveals that, even among very serious youthful offenders, the vast majority stop committing crimes by age 25. This time line correlates with research on when brain development is complete and individuals are less prone to immature behavior.[14]

This body of scientific research is significant as to Mr. Pacheco Padilla's culpability. At the age of 20, he was at the peak of the period of risky behavior – recognized by the Supreme Court in *Roper v. Simmons* – where a young adult's brain is not able to anticipate the future consequences of his actions. Evidence of this immature sense of responsibility can be found in Mr. Pacheco Padilla's explanation of what influenced him to commit the offense: "The thing is I didn't know what it was. I just had to go deliver it. I didn't understand that what I had to do was so bad." PSR ¶ 18. In other words, he failed to weigh the risks and rewards of agreeing to deliver drugs for his friend. He acted

---

Phil. 256, 259 (2013); accord Hochberg & Konner, Emerging Adulthood.
[7] *Id.* at 259.
[8] *Id.*
[9] *Id.* at 259–260.
[10] *Id.* at 260.
[11] Taber-Thomas & Pérez-Edgar, *Emerging Adult Brain Development in The Oxford Handbook of Emerging Adulthood* 126-27 (2015).
[12] *Roper v. Simmons*, 543 U.S. 551, 569 (2005).
[13] Arnett, *Emerging Adulthood*, 55 Am. Psychol. at 474–475.
[14] Monahan et al., Psychosocial (Im)maturity From Adolescence to Early Adulthood: Distinguishing Between Adolescence Limited and Persisting Antisocial Behavior, 25 Dev. & Psychopathology 1093, 1093–1105 (2013).

impulsively, without thinking it through, and only now appreciates the harm that he was involved in causing. This same impulsive brain may have contributed to his decision to leave home and walk north to look for work, without considering the toll that living alone in a foreign country could take on him. See, PSR ¶ 46.

After years of gainful employment and trying to live under the radar to avoid being deported, Mr. Pacheco Padilla moved to California looking for better work. Within a few months he was arrested in this case. His impulsive decision to deliver something for a friend, without evaluating what it was and what could happen to him if he did it, has ended tragically. He has a pending warrant for removal from ICE and now that he is in custody he will be removed from the United States following his custodial sentence. PSR ¶ 44. With a felony drug distribution conviction, Mr. Pacheco Padilla will not be able to return to the United States lawfully. He cannot obtain a green card later in life. The consequences of his case on his life are huge, and he knows it.

### iv.     A hope for the future

One silver lining for Mr. Pacheco Padilla is that he gained valuable skills when he was employed before his arrest. He is optimistic that he can find work in Honduras now that he knows how to weld, install roofing and assist on a construction crew. PSR ¶ 43. His intention is to return home and hopefully get a job at a local welding shop in his town. He does not want to ever return to the United States and knows that he cannot do so lawfully.

### v.     **Early Acceptance of Responsibility**

Mr. Pacheco Padilla's actions show that he truly and fully accepts responsibility for his crime. He expressed his desire to accept responsibility while the case was still pending in magistrate court. He was open with defense counsel from the start and accepted the terms of a plea agreement early in the case. His initial appearance before your honor was also the date of his change of plea hearing.

When speaking with the probation officer about his offense, Mr. Pacheco Padilla expressed shame and remorse about delivering drugs. PSR ¶ 18. His parents always gave him good advice, but he was alone here and he failed. Reflecting back on what he had done, Mr. Pacheco Padilla said that "In the end, I have caused so much harm, including to myself. This is a lesson to not do bad things. A lesson is to listen to people who give you good advice. You have to be careful to set a good example.

You would hate to know one of your relatives or siblings are out there doing drugs." PSR ¶ 18. These are the words of a young adult who is maturing, who is learning from his mistakes and sees the harm that his actions have caused. This is personal growth. It is true acceptance.

### b) 3553(a)(2) – The Need for the Sentence Imposed

Section 3553(a)(2) directs the Court, in determining the particular sentence to be imposed, to consider the need for the sentence imposed "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Mr. Pacheco Padilla's offense is serious because he was distributing a toxic drug into our society. Many people are harmed by drug addiction every day. He didn't appreciate that before, but he does now. For the past six months, Mr. Pacheco Padilla has had nothing but time to learn the hard lesson that an offer to make money by just delivering something for a friend is a red flag. He has learned to stop and consider the risks of his actions and think through what might result. Mr. Pacheco Padilla never suffered for a lack of respect for the law; He knew what he did was wrong and accepted responsibility early. His failure was in not appreciating the risk of getting involved in delivering drugs, of not seeing how harmful the consequences could be.

But at this point, he has been adequately punished for his crime. He played a minor role in one transaction and acted at the direction of a co-conspirator. When he arrived to the U.S. he quickly got work in construction – not selling drugs – and learned how to weld and install roofing. He worked for several years before he was involved in this criminal conduct. Given his work history, Mr. Pacheco Padilla's impending removal back to Honduras is a factor that weighs in favor of a short custodial sentence. Removal is a harsh consequence that will afford adequate deterrence and protect the public. Mr. Pacheco Padilla can't return to the United States without facing illegal reentry charges and the term of supervised release that this court must impose in this case. He can't ever get a green card with this conviction on his record. That part of his life is over. Under these circumstances, a sentence of 6 months in custody is sufficient to reflect the seriousness of the offense, promote respect for the law,

afford just punishment and adequate deterrence from further criminal conduct.

          **c)        Section 3553(a)(6) – Unwarranted Sentence Disparities**

Section 3553 also provides in imposing a sentence, the Court must consider "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." §3553(a)(6); See also *United States v. Caperna*, 251 F.3d 827, 830-31 (9th Cir. 2001). Mr. Pacheco Padilla's conduct is comparable to a defendant who would qualify for immediate removal under the government's Fast Track program, but for the geographic context of his arrest. The quantity of drugs he possessed for distribution and his role of delivering them at the direction of another person are unremarkable. If he had been standing on the corner of Larkin and Hyde Streets in San Francisco when committing these acts, the government would almost certainly have flagged him for immediate removal. Mr. Pacheco Padilla has already served a significantly longer sentence than similarly situated defendants for whom the government chose to offer a Fast Track. It is appropriate under these circumstances for the Court to vary downward to a time served sentence in order to avoid any further unwarranted disparity in sentencing Mr. Pacheco Padilla.

## CONCLUSION

For the reasons set forth above, Mr. Pacheco Padilla respectfully moves the Court to impose a sentence of time served. He requests removal to Honduras as soon as possible. This sentence is sufficient but not greater than necessary to meet the goals of sentencing in light of his youth, his upbringing, and his role in the offenses.

Dated: May 14, 2025                    Respectfully submitted,

                                                      /S/
                                        JOANNA SHERIDAN
                                        Counsel for defendant, Allan Pacheco Padilla